**C. L. KING and Monarch Real Estate Corporation, Appellants,**

v.

**Charles W. TUBB and Don Middlebrook, Appellees.**

**No. 1117.**

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1977.

Lynn N. Hughes, Howard & Hughes, Roy L. Wardell, Howard & Hughes, W. James Kronzer, Kronzer, Abraham & Watkins, Houston, for appellants.

Larry E. Wadler, Wadler & Webb, William A. Cline, Jr., Cline & Cline, Wharton, for appellees.

## OPINION

NYE, Chief Justice.

This is a real estate fraud case. Suit was brought by Charles W. Tubb and Don Middlebrook against C. L. King and Monarch Real Estate Corporation to recover moneys advanced to King and Monarch for the purchase of a 646.74 acre tract of land in Wharton County. Trial was to the court. From a judgment awarding Tubb and Middlebrook $188,226.72, appeal has been perfected to this Court.

Don Middlebrook, a licensed real estate broker, approached Harold Seller about the sale of some 2,741 acres owned by Seller in Wharton County. Middlebrook obtained a listing to sell this land. Middlebrook then approached C. L. King, a Houston real estate businessman and president (and 100% stockholder) in Monarch Real Estate Corporation, about the possible sale and development of this land. It was decided that 647 acres of the land could be used to develop an industrial park. King and Middlebrook then began to solicit investors in the project. They set up the Wharton Industrial Trust with Middlebrook as the trustee. The purpose of the Trust, in addition to raising the money to purchase and develop the land, was two-fold. The first purpose was to prevent any direct connection between the purchasers of the property and Don Middlebrook. The second purpose was evidently to clarify the proportion each investor would receive upon resale of the developed property. Regardless of the purpose, investors did put their funds into the Trust. One of the first potential investors approached was Charles Tubb, who not only invested $30,000.00 in the Trust, but also offered to solicit additional investors. King, Middlebrook and Tubb then entered into an agreement whereby they might purchase the property themselves. Several investors were acquired and approximately $70,000.00 was raised to purchase the property.

Sometime thereafter, the plan to acquire the land was devised. It was proposed that the Trust would put up the down payment on the land which would be taken in King's name. This amounted to a payment of $2,000.00 per acre of which $128,726.72 was paid in cash and the remainder $1,285,340.00 was to be paid on a note executed to the original landowner, Seller. The plan was then to simultaneously transfer the property to the Trust at a down payment of some $220,000.00 greater than the initial down payment plus assumption of the note held by the original landowner. Before this deal was consummated, King and Middlebrook obtained a "Back-up contract" from Carl Almquist whereby Almquist would buy the land at a profit to the Trust if the development of the land proved unsuccessful. On December 13, 1974, the first half of the transaction was closed. Prior to the closing, it was discovered that the Trust was short some $50,000.00 on the initial down payment. At that juncture, King came up with $10,500.00, Tubb came up with $15,000.00 and Middlebrook $11,046.61 to consummate the deal. In addition, Middlebrook credited $32,180.00 of his commission on the sale to the down payment raising the total down payment to $128,726.72.

It was at this point that the transaction encountered difficulty. The second sale, from King to the Trust, was not consummated because the Trust did not have sufficient funds. At this point, King was the record owner of the property but was faced with making payment on the note and did not have any funds from which to make the payments. Shortly thereafter, the present litigation now before this Court was commenced.

Initially, Tubb brought suit against King and Middlebrook to recover his $45,000.00 invested in the project. In connection with this suit, a lis pendens was filed against the property. Middlebrook filed an answer to Tubb's claims and brought a cross claim against King and Monarch to recover $188,-180.11 in actual damages plus $376,360.22 in exemplary damages. Middlebrook's actual damages consisted of $96,546.61 of trust funds, less the $10,500.00 put up by King, used for the down payment plus his $32,-133.60 in commissions plus the $20,000.00 earnest money on the second contract for the sale of the land plus $50,000.00 earnest money on a contract wherein he and King and Paul Hughes were attempting to purchase 2,375.08 acres of land in Matagorda County. King filed an answer to both of these sets of claims and then filed a counterclaim and cross claim against Middlebrook, Tubb, Raymond L. Torp, Mary Middlebrook, Martha Middlebrook, Mike Allison and Joe Allison. King's cross claim against Middlebrook was for failure to execute the second contract. King's claim against all the parties was that they had conspired to tie up his land with their lawsuits and sought $376,789.50 damages and $50,000.00 exemplary damages. Monarch denied all claims against it. All of the parties denied King's claims.

At the conclusion of testimony, the trial judge entered judgment in the amount of $188,226.72 for Middlebrook and Tubb. Middlebrook's recovery was for $70,000.00 in earnest money plus $73,226.72 in funds used by King for the down payment on the land (total: $143,226.72). Tubb recovered $45,000.00 for funds used by King to purchase the property. All of King's counterclaims were denied as were the remaining claims of Middlebrook and Tubb.

The first ground of recovery by Middlebrook and Tubb against King and Monarch found by the trial court was for fraud. Specifically, the trial court concluded that the facts established that King had violated § 27.01 of the Business and Commerce Code (1968). Section 27.01(a) states:

"(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract; or

(2) false promise to do an act, when the false promise is

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into a contract; and

(D) relied on by that person in entering that contract."

In support of this conclusion, the trial court made the following findings of fact: King represented to Middlebrook and Tubb that he was experienced in developing industrial parks and would assist King and Tubb in purchasing and developing the subject land; that Middlebrook relied on representations of King as to development and raising of funds; that King represented to Tubb, Torp and H. F. Means that he would help develop the land and in reliance on these representations, Tubb invested $45,000.00, Torp invested $20,000.00, Allison invested $30,-000.00 and Middlebrook invested $11,046.61; that King repudiated these representations to Middlebrook and Tubb to develop and stated his only intention was to make a $226,000.00 profit; that his prior representations were made to induce Middlebrook, Tubb and Torp to invest in the property; that the representations of King were material factors inducing Middlebrook and Tubb to enter into the various agreements and contracts involved; and that King benefited from his false statements by purchasing the land.

The elements of actionable fraud under § 27.01 are a false statement made by the party charged; reliance on the statement by the parties claiming fraud; action in reliance on the statement and damages

resulting from such fraud. *Susanoil, Inc. v. Continental Oil Company*, 519 S.W.2d 230 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.); *Morgan v. Box*, 449 S.W.2d 499 (Tex.Civ.App.—Dallas 1969, no writ). See *Kain v. Neuhaus*, 515 S.W.2d 45 (Tex. Civ.App.—Corpus Christi 1974, no writ); *Brady v. Johnson*, 512 S.W.2d 359 (Tex.Civ. App.—Austin 1974, no writ); *Brooks v. Parr*, 507 S.W.2d 818 (Tex.Civ.App.—Amarillo 1974, no writ); *Long v. Smith*, 466 S.W.2d 32 (Tex.Civ.App.—Corpus Christi 1971, writ ref'd n. r. e.).

■ We agree that the trial court's findings of fact are supported by sufficient evidence and such findings are sufficient to support the trial court's conclusion that § 27.01 was violated by King. Because of appellant's numerous points of error challenging the legal and factual sufficiency of the evidence, we will follow the familiar rules of law which govern the disposition of such points as found in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951) and Calvert, "No Evidence and Insufficient Evidence Points of Error". 38 Tex.L.Rev. 359 (1960). We will take up each element of fraud and the evidence we find that supports such elements. The first element found by the trial court was that King made a false statement to Middlebrook and Tubb. The false statement made by King was that he would assist Middlebrook and Tubb in developing the land. As a general rule for a statement to be fraudulent, it must be a statement as to a present existing fact. However, as here, where the representation is a promise to do an act in the future and there exists at the time of the representation an intention not to perform, such representation implies an existing fact. It is in effect the present intention of the speaker not to perform in the future that makes the representation a present false statement. The failure of the speaker to perform the promise does not, in and of itself, prove the existence of an intention not to perform the promise at the time the promise was made. If, however, the party making the promise denies making such promise, that alone is sufficient evidence to support a finding of lack of intent

to perform at the time the statement was made. *Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex.Sup.1971); *Bond v. Duren*, 520 S.W.2d 460 (Tex.Civ.App.—Waco 1975, writ ref'd n. r. e.); *Markman v. Gaitz*, 499 S.W.2d 692 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n. r. e.); *Stone v. Williams*, 358 S.W.2d 151 (Tex.Civ.App.—Houston 1962, writ ref'd n. r. e.); and see *Mangum Road Center v. DiSclafani*, 450 S.W.2d 130 (Tex. Civ.App.—Houston [14th Dist.] 1969, writ ref'd n. r. e.).

■ Middlebrook's testimony demonstrates that King represented to him that he would assist him in developing the land as does the testimony of Raymond Torp, Paula Torp, and Harold Seller. Tubb and Middlebrook testified that soon after the first sale was closed, King told them he was not going to assist them in developing the property. Even the testimony of King himself was contradictory. In his deposition, King stated he was buying the land for himself. Later when reminded of these statements, he remembered making the statements and then said he never actually intended to purchase the land for himself. In addition, he testified his only position in the deal was to act as a go between for the purchase of the land and resale to the Trust. He stated that for this service, he was to receive $220,000.00. He admitted he allowed Middlebrook to represent to others that he had expertise in developing industrial tracts. Later, he stated that he never told anyone he was going to develop an industrial park.

From this testimony, it is apparent to us that there was sufficient evidence that King promised to assist in the development of the land and that he then later denied ever making such a representation. These statements by King were material representations and amounted to more than statements of opinion or expectation. Therefore, the trial court was correct in finding that King made a false representation.

In reference to the second element of proof under § 27.01 that there was reliance on the false statement by the party charg-

ing fraud, we find ample evidence in the record. Middlebrook testified that he relied on King's representations and the trial court so found. Although the trial court made no specific finding of reliance by Tubb, there is sufficient evidence in the record to support such a finding. Since all the remaining elements of fraud were found by the trial court as to Tubb's cause of action, we presume and so hold that the trial court impliedly found Tubb relied on King's statements. See Rule 299, T.R.C.P.; *Red Arrow Freight Lines, Inc. v. Howe*, 480 S.W.2d 281 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.) and authorities cited therein. The appellant does not attack any of the findings of the trial court on the remaining elements of fraud under § 27.01. Suffice it to say, we hold there was sufficient evidence to support the trial court's judgment that King defrauded Middlebrook and Tubb.

Not only did the trial court find that King had defrauded Middlebrook and Tubb, which by itself constituted sufficient grounds for recovery, the court also found, as a separate ground of recovery, that King and Tubb were entitled to recover the funds advanced under "Assumpsit". A cause of action for assumpsit arises when money is paid for the use and benefit of another if made at the beneficiaries' request or if the beneficiary adopted or took advantage of the money. 6 Tex.Jur.2d Assumpsit § 6 (1959). This form of recovery amounts to a quasi-contractual obligation to repay funds advanced for another's benefit. See *Fun Time Centers, Inc. v. Continental National Bank of Fort Worth*, 517 S.W.2d 877 (Tex. Civ.App.—Tyler 1974, writ ref'd n. r. e.).

The evidence is undisputed that King received record title to the land upon payment of the $128,680.00 down payment. The record is equally undisputed that of this $128,680.11 down payment, only $10,-500.00 was King's personal funds, the remainder of the money came from the appellees. King himself admitted that these moneys should be repaid. Therefore, all the necessary elements of assumpsit were present. Money was given to King which

he used to his benefit and which he acknowledged he owed a duty to repay. Since all of the elements are supported by the evidence, the trial court was correct in rendering judgment against King for the amounts advanced to him by Tubb and Middlebrook.

Appellant's argument against the trial court's assumpsit judgment is that there was no evidence or insufficient evidence of any express or implied promise by King to repay the money given him by Tubb and Middlebrook and, therefore, there was no loan upon which the appellees were entitled to recover. In a suit to recover money received by another, the complaining party must only show that the defendant holds money which in equity and good conscience belongs to the plaintiff. See *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686 (1951). Where one seeks a recovery in assumpsit, he must only show the pertinent facts involved and the court will grant the proper relief. *Orgain v. Butler*, 478 S.W.2d 610 (Tex.Civ.App.—Austin 1972, no writ). Assumpsit is a recovery for the unjust retention of a benefit to the loss of another, or the retention of money of another against the fundamental principals of justice and equity. *Fun Time Centers, Inc. v. Continental National Bank of Fort Worth, supra.* As the record clearly demonstrates and as King's testimony readily admits, King received the record title to the land primarily on money advanced by others at an actual expenditure to himself of only a relatively small amount. It was stated in *Jones v. Hydro Corporation*, 420 S.W.2d 210 (Tex.Civ.App.—Amarillo 1967, no writ), where a benefit is received and accepted, the promise to pay for such benefit will be implied in law. See *Resendiz v. Resendiz*, 367 S.W.2d 220 (Tex.Civ.App.—San Antonio 1963, no writ). The case of *Acoustical Screens In Color, Inc. v. T. C. Lordon Company, Inc.*, 524 S.W.2d 346 (Tex.Civ.App.—Dallas 1975, writ ref'd n. r. e.) is analogous to the case before us. In the above case, the appellee had advanced $25,170.00 to the appellant for the purpose of promoting appellant company. In consideration for

these advances, appellee was to receive stock in appellant company. The stock was never issued to appellees and they sought to recover their advance. The court held that since the funds were not a gift but were based on a future agreement which failed to materialize, equity required the return of appellees' funds.

■ In addition to the trial court's separate holdings of recovery under fraud and assumpsit, Tubb and Middlebrook are also entitled to a recovery under a combination of both theories. In *Wichita County v. Tittle*, 27 S.W.2d 649 (Tex.Civ.App.—Amarillo 1930), aff'd 41 S.W.2d 11 (Tex.Comm'n App.1931), it was held that where funds are obtained by fraud, the law will imply a promise from the recipient of the money to return it to the lawful owner.

■ The appellant's other argument concerning the assumpsit recovery is that King, Middlebrook and Tubb were partners or joint venturers in the purchase. It is King's contention that such a relationship precludes an assumpsit recovery. Tubb did testify that his understanding of the deal was for King, Middlebrook and himself to acquire the property as partners or in some joint relationship. Tubb and Middlebrook testified, however, that King later renounced any such relationship and claimed the property for himself. King never specifically stated what the relationship was between himself, Middlebrook and Tubb. Based on these facts, it is apparent to us that equity dictates that King should return the funds to those who advanced the same to him. Even if some joint relationship existed at the outset between King and the other litigants, that relationship was renounced by King himself after he had used funds that were not his own to acquire the land. As in the *Acoustical Screens* case, (supra), where the agreement or relationship fails to materialize, equity dictates that the funds that were advanced should be returned.

Next, we consider the propriety of the trial court's action in awarding as part of the total judgment $20,000.00 advanced by Middlebrook on a second contract for the sale of the land. It is the appellant's contention that the trial court erred in holding that Middlebrook was unable to perform the contract because the title was unmerchantable because of the filing of the notice of lis pendens by Tubb and Allison after the original pleadings in this suit were filed.

On January 28, 1975, Tubb and Allison filed suit against King seeking to impose upon the land in question a constructive trust in the amount of $75,000.00. In addition to filing suit, Tubb and Allison filed a notice of lis pendens against the property on January 30, 1975. On June 6, 1975, Middlebrook filed his original counterclaim against King and Monarch to recover, among other things, the $20,000.00 earnest money put up by the Trust to purchase the land from King. It was Middlebrook's contention that the contract could not be consummated because of the lis pendens notice which rendered the title unmerchantable thereby entitling him to the return of the earnest money. The contract in question provided that King would sell to the Trust the 647 acres of land at $2,500.00 per acre. The contract required $20,000.00 in earnest money. The sale was to be closed no more than 60 days after the buyer received the commitment of title insurance. Mrs. Georgia Willis testified that the title report was sent to Middlebrook on December 2, 1974. She also testified that on January 29, 1975, she received notice of the lis pendens against the property which was one day prior to the last day for closing the sale. The record conclusively establishes that during the closing period, the lis pendens was filed thereby preventing the closing of the sale. The notice of lis pendens was in full compliance with Tex.Rev.Civ.Stat.Ann. (1964), art. 6640.

The earnest money contract specifies in paragraph 7 that if the seller is unable to fulfill his obligations under the contract by reason of defect in title, the buyer may terminate the agreement and have his earnest money returned.

■ The ultimate effect of lis pendens is to prevent either party to certain

litigation from alienating the property that is in dispute. *Black v. Burd*, 255 S.W.2d 553 (Tex.Civ.App.—Fort Worth, 1953, writ ref'd n. r. e.). It is a well settled rule of law in this State that a purchaser of land pendente lite stands in no better attitude than his vendor. *Rio Bravo Oil Co. v. Hebert*, 130 Tex. 1, 106 S.W.2d 242 (1937); *Randall v. Snyder*, 64 Tex. 350 (1885); *Willis v. Ferguson*, 59 Tex. 172 (1883) and cases cited therein. The very purpose of the statutory lis pendens notice is to put those interested in the land on inquiry as to the status of the land. *Kropp v. Prather*, 526 S.W.2d 283 (Tex.Civ.App.—Tyler 1975, writ ref'd n. .r. e.). Therefore, it is apparent that the filing of the lis pendens notice by Tubb and Allison rendered King's title to the land defective and justified Middlebrook's failure to consummate the sale, resulting in his claim for the return of his $20,000.00 earnest money. Regardless of the fact that Tubb and Allison later released the lis pendens against the land at the time the contract was to be closed, King no longer had a title to the land clear of defects. The trial court was correct in granting judgment against King and Monarch for the $20,000.00 in earnest money. Since the trial court was correct in holding that the lis pendens rendered the contract unperformable, it is unnecessary for us to consider the propriety of the trial court's findings that the property description in the contract was too vague and indefinite and was incapable of being located on the ground.

The next question presented by this appeal is whether or not Middlebrook is entitled to recover $50,000.00 in his individual capacity as a part of the total judgment rendered in his favor, when such money came into his hands originally as trustee of the Wharton Industries Trust. As we have heretofore stated Joe Allison and Dr. Raymond Torp invested $30,000.00 and $20,000.00, respectively, with Middlebrook as trustee of the subject Trust. This money was part of the money that was turned over to King. After Tubb filed suit against King and others, Middlebrook voluntarily repaid Allison and Torp the amount of moneys they had invested with him. It is the

appellant's contention that $50,000.00 of the total judgment constitutes the $30,000.00 invested by Joe Allison and $20,000.00 invested by Dr. Raymond Torp. The record shows that although Middlebrook repaid each of these parties out of his own pocket, he failed to receive any assignment of their claim or chose in action against King. Middlebrook did not plead any such assigned claims, nor did he offer any evidence of these assignments. Allison and Torp testified that the money invested was returned by Middlebrook to them.

Regardless of whether or not Middlebrook was assigned whatever causes of action Allison and Torp may have had against King, Middlebrook was still entitled to recover these funds from King in his capacity as trustee of the Wharton Industries Trust. Middlebrook brought a cross-action, both individually and as trustee, against King and Monarch for the amounts awarded him in the judgment. It is undisputed that Allison invested $30,000.00 in the Trust and Torp invested $20,000.00. It is equally undisputed that Middlebrook was trustee of the Trust. Article 7425b–25(E), Tex.Rev.Civ.Stat.Ann. (1960) provides that a trustee of an express trust is authorized to contest any and all claims of the trust estate. Therefore, regardless of whether or not Torp and Allison individually had a claim against King and had assigned that claim to Middlebrook, he was entitled to bring suit in the name of the Trust and recover for the Trust in his capacity as trustee.

Appellant argues in his reply brief that a certain paragraph of the Trust prohibits such action by Middlebrook by providing that any assignment of a beneficial interest in the Trust be transferred only by an assignment in writing. This particular provision has no relationship to the action brought by Middlebrook. The beneficial interest referred to in the subject paragraph of the Trust instrument is the percentage of interest in the Trust owned by each investor as illustrated by a certain schedule "A" which is attached to the Trust instrument. This paragraph does not require the

trustee to obtain a written assignment of interest from each investor before bringing suit on behalf of the Trust.

■ The only problem created by our holding is that the trial court's judgment awards Middlebrook a total judgment of $143,226.72, individually. The judgment does not award $50,000.00 of the total amount to Middlebrook in the capacity as trustee. However, under Rule 434, T.R.C.P. (Supp.1976), this Court may and should render the judgment which it deems should have been rendered by the trial court where it appears from the face of the record that modification is necessary. *Carter v. Barclay*, 476 S.W.2d 909 (Tex.Civ.App.—Amarillo 1972, no writ); *Wofford v. Miller*, 381 S.W.2d 640 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n. r. e.); *Craft v. Hahn*, 246 S.W.2d 897 (Tex.Civ.App.—Eastland 1952, writ ref'd n. r. e.). It is clear from the record in this case that everyone who advanced funds to King for the purchase of this property is entitled to the return of these funds. To hold that Middlebrook could not recover the $30,000.00 invested by Allison and the $20,000.00 invested by Torp would require him to bring this same suit on the same grounds simply to recover a judgment specifically in his capacity as trustee of the Trust against King. The better reasoned procedure which we adopt would be for this Court to modify the judgment to state that Middlebrook recover $50,000.00 of the total judgment as Trustee of the Wharton Industrial Trust.

Appellant next complains of the trial court's findings that the Monarch corporate entity was never differentiated from the individual entity of King and that the corporate entity of Monarch was disregarded by King and was really only a depository for earnest money collected by King. Based on these findings, the trial court rendered judgment against King and Monarch for a portion of the total judgment representing the earnest money put up with King and Monarch by Middlebrook, individually and as trustee for the Wharton Industrial Trust.

■ As a general rule, the corporate entity will not be disregarded unless there are compelling reasons to disregard. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196 (Tex.Sup.1962); *Pace Corporation v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955); *First Nat. Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100 (Tex.Comm'n App. —1939, opinion adopted); *Minchen v. Van Trease*, 425 S.W.2d 435 (Tex.Civ.App.— Houston [14th Dist.] 1968, writ ref'd n. r. e.). The most recent statement by the Supreme Court of the test for disregarding the corporate entity is found in *Bell Oil & Gas Company v. Allied Chemical Corporation*, 431 S.W.2d 336 (Tex.Sup.1968). In that case, the court held:

". . . that the corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement, or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part."

■ The entire record indicates that King and Monarch were one entity. King seemed to switch positions at will, sometimes acting in his individual capacity, sometimes acting through Monarch. As an example, the record indicates that the $10,-500.00 he put up for the original down payment was Monarch's funds, yet he took title to the land individually. He transferred earnest money back and forth stating that he held the money and then explaining that it was held in the Monarch Trust account. It appears from the entire record that King used Monarch to achieve inequitable results by using the corporation as an unfair device to prevent Middlebrook from obtaining the return of his earnest money.

The next question presented by appellant involves the trial court's action in awarding Middlebrook the refund of his $50,000.00 earnest money on the "Matagorda contract". The Matagorda contract itself was

not introduced into evidence. From the record the transaction may be reconstructed as follows: King, Middlebrook and a Paul Hughes entered into an earnest money contract with Thomas Garrett to purchase 2,375.08 acres of land in Matagorda County. King and Middlebrook put up $100,000.00, ($50,000.00) as earnest money on the contract. This money was deposited by Middlebrook and King with King's corporation, Monarch. The deal fell through due to a defect in title. King was refunded his $50,-000.00 earnest money by Monarch. However, Monarch and/or King refused to refund Middlebrook his $50,000.00. King stated that he had transferred the money from the first escrow account held by Monarch to another escrow account for the Almquist's "back-up contract" account, that Monarch was holding. This action was taken by King after he had refunded to Almquist the $50,000.00 Almquist had deposited with King on the original option contract. King admitted he had transferred these funds without Middlebrook's permission and his only reason for the transfer was that he thought Almquist had a claim against Middlebrook for these funds. Almquist stated that he had no claim against either Middlebrook or King. The trial court was correct in awarding judgment to Middlebrook against King and Monarch.

Appellant complains, however, that the trial court abused its discretion in not granting his motion for dismissal or separate trial of Middlebrook's cross action on this Matagorda contract. The basis for appellant's motion was that the action was a separate and distinct transaction from the main suit filed by Tubb. The trial court took appellant's motion under consideration and chose to rule after all of the evidence was presented.

▮▮▮ Rule 97(e), T.R.C.P. (Supp.1976) states that a pleading may state as a cross action any claim by one party against a coparty arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein. The Texas Courts have been notably liberal, in furtherance of their policy of avoiding multiplicity of suits, in the construction applied to cross-claims, in order to hold that they are sufficiently connected with the subject matter in controversy to be proper. See 52 Tex.Jur.2d, Setoff, Counterclaim, and Cross Actions § 48 (1964). McDonald Texas Civil Practice § 7.56 (1970) and cases cited therein. Rule 97(e) was adopted unchanged from Federal Rule 13(g). The test used by the Federal Courts is the logical relationship test, and that is, whether the cross-claim involved has many of the same factual and legal issues presented in the main action. *Lasa Per L'Industria Del Marmo Societa Per Azioni of Lasa, Italy v. Alexander*, 414 F.2d 143 (6th Cir. 1969). We find that the present cross action meets this test.

▮▮▮ Tubb's original causes of action against King and Middlebrook were: against Middlebrook for breach of the Trust agreement; against King and Middlebrook for fraud; and against King for unjust enrichment concerning the Wharton County land. As was stated earlier Middlebrook cross-claimed against King and Monarch for his $50,000.00 earnest money on the Matagorda deal. King's testimony showed that the $50,000.00 Middlebrook put up on the Matagorda land was transferred by King to the escrow account on the Almquist's back-up contract which was on the original Wharton County land. Therefore, the evidence demonstrates that Middlebrook's $50,000.00 was a part of the Wharton County transaction upon which Tubb brought suit against King and Middlebrook. There was an identity of factual issues present between Tubb's claims and the cross-claim of Middlebrook. Although the identity of the two causes of action is not readily apparent from the pleadings, the trial court wisely heard the evidence which ultimately revealed the identity of all of the issues. We hold that the trial court did not abuse its discretion by failing to order separate trials under Rule 174(b), T.R.C.P. (Supp. 1976).

▮▮▮ Appellant's next complaint is that the trial court erred as a matter of law in awarding Middlebrook the $50,000.00 ear-

nest money on the Matagorda contract because the necessary parties were not before the court. This point of error is in reference to the fact that Paul Hughes, a co-purchaser of the property with King and Middlebrook, and a Thomas Garrett, the seller, were not made parties to the action. Without getting into an unnecessary discussion of Rule 39, T.R.C.P. and the distinction between proper, necessary and indispensable parties, the record clearly reflects that the trial court's judgment was not dependent on the presence of either of the absent parties to the Matagorda contract. The record clearly shows that Hughes had nothing invested in the contract and that Garrett evidently agreed to the refund of the earnest money due to some defect in his title to the land. Since it is apparent that Middlebrook's cross-claim for the return of his $50,000.00 was against King and Monarch alone, the other two parties' absence does not effect the trial court's judgment.

Appellee Charles Tubb has presented one cross-point of error for this Court's consideration. Appellee Middlebrook, in response to Tubb's cross-point, has filed a motion to dismiss the cross-point due to the alleged failure of Tubb to properly perfect his cross-appeal.

█ It is an old court made rule of law in this State that unless the entire judgment is brought forward on appeal, an appellee must apprise the trial court of his dissatisfaction with the judgment before his cross-points of error may be considered. *West Texas Utilities Company v. Irvin*, 161 Tex. 5, 336 S.W.2d 609 (1960); *Dietz v. Dietz*, 540 S.W.2d 418 (Tex.Civ.App.—El Paso 1976, no writ); *Upjohn Company v. Petro Chemicals Suppliers, Inc.*, 537 S.W.2d 337 (Tex.Civ.App.—Beaumont 1976, writ ref'd n. r. e.); *National Farmers Organization v. Smith*, 526 S.W.2d 759 (Tex.Civ.App.—Corpus Christi 1975, no writ); *Portwood v. Buckalew*, 521 S.W.2d 904 (Tex.Civ.App.—Tyler 1975, writ ref'd n. r. e.); *Payne v. Lucas*, 517 S.W.2d 602 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n. r. e.); *White Stores, Inc. v. Crain*, 515 S.W.2d 677 (Tex.Civ.App.—Austin 1974, no writ);

*Flagg Realtors, Inc. v. Harvel*, 509 S.W.2d 885 (Tex.Civ.App.—Amarillo 1974, writ ref'd n. r. e.); *Maloney v. Strain*, 410 S.W.2d 650 (Tex.Civ.App.—Eastland 1966, no writ).

█ This is not to say that an appellee must perfect a separate appeal in order to present cross-points on appeal in every situation. *Travelers Indemnity Company v. Pollard Friendly Ford Company*, 512 S.W.2d 375 (Tex.Civ.App.—Amarillo 1974, no writ).

█ Recent changes in the rules of civil procedure make it increasingly difficult for an appellee to perfect his cross-points following the above quoted rule. As of January 1, 1976, notice of appeal is no longer necessary. See amended Rule 353, T.R.C.P. and Rule 363. Where the trial was to the court, no motion for new trial is required to bring forward points of error. Rule 324, T.R.C.P. It is equally well recognized that an appellee need not file a cost bond to present cross-points of error. *Dietz v. Dietz, supra.* The question now is: how in a practical manner would an appellee, in such cases, apprise the trial court of his dissatisfaction? We find the answer most difficult. In some cases, an appellee may raise his cross-point for the first time in his original brief. Therefore, where, as in the case at bar, an appellee really has no mandatory steps he must take to perfect his cross-point; yet, the prevailing view of the law in this State is that he must take some steps (whatever they may be) to apprise the trial court of his dissatisfaction with the judgment. We think that in a judge tried case, it would be best to consider such cross-points when raised for the first time in appellee's brief. Rule 420, T.R.C.P. The appellant would answer such points in a reply brief as usual.

█ In the case at bar, the judgment was severable and that portion of the judgment complained of by Tubb was not brought forward by King. Tubb's cross-point of error is that the trial court should have entered judgment for him against Middlebrook because Middlebrook misused the trust funds as trustee. Having re-

**448**

viewed the record on this question, however, regardless of whether or not appellee's cross-point is properly before this Court, we hold that it is without merit. The record shows that Tubb was fully aware of Middlebrook's use of the Trust funds and in fact openly encouraged the course of action pursued by Middlebrook. Appellee's cross point is overruled.

The judgment of the trial court is, therefore, modified in the following respects:

(a–1) against C. L. King and Monarch Real Estate Corporation in favor of Don Middlebrook: $ 50,000.00

(a–2) against C. L. King and Monarch Real Estate Corporation in favor of Don Middlebrook, Trustee: 20,000.00

(b–1) against C. L. King in favor of Don Middlebrook: 43,226.72

(b–2) against C. L. King in favor of Don Middlebrook, Trustee: 30,000.00

(c) against C. L. King in favor of Charles W. Tubb: 45,000.00

Total amount of judgment: 188,226.72

The judgment of the trial court as modified is AFFIRMED.